# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

CHRISTOPHER CLEVELAND,     )
     )
         Plaintiff,     )
     )
vs.     )     Case No. 13-CV-375-TCK-PJC
     )
TERRY MARTIN, MAURICE WARRIOR     )
GLENN WALDON, JUSTIN JONES,     )
JACLYN RIVERA, MARK KNUTSON     )
     )
         Defendants.     )

## OPINION AND ORDER

On May 31, 2013, Plaintiff Christopher Cleveland, a prisoner appearing pro se and in forma pauperis, filed a 42 U.S.C. § 1983 civil rights complaint (Dkt. # 1), against Terry Martin, Warden at Dick Conner Correctional Center (DCCC); Maurice Warrior, Deputy Warden at DCCC; Glenn Waldon, Unit Manager at DCCC; Justin Jones, then-Director of Oklahoma Department of Corrections (DOC); Jaclyn Rivera, Assistant District Attorney for Oklahoma County; and Mark Knutson, Director's Designee for DOC Administrative Review. Plaintiff claims Defendants have improperly restricted visitation with his children in violation of his constitutional rights. Id.

On October 23, 2013, Defendants filed a Special Report (Dkt. # 30), and a Motion to Dismiss or in the alternative, Motion for Summary Judgment (Dkt. # 31). On November 8, 2013, Plaintiff filed a response to Defendants' motion (Dkt. # 32). On December 19, 2013, Defendants filed a supplement to the Special Report (Dkt. # 38), and supplemental briefs in support of their motion to dismiss or in the alternative, motion for summary judgment (Dkt. ## 39, 40). Plaintiff filed supplemental responses (Dkt. ## 43, 44).

For the reasons discussed below, the Court finds that the Defendants are entitled to summary judgment in their favor and their motion is granted as no genuine dispute of material fact exists.

## BACKGROUND

In 2004, Plaintiff and his wife, Huyen Ai Thi Tran (Tran), were charged in Oklahoma County District Court, Case No. CF-2004-1113, with multiple counts of child abuse.  On May 4, 2007, Plaintiff and Tran entered pleas of nolo contendre and received deferred sentences.  On January 28, 2009, the State filed charges of Perjury against Plaintiff and Tran in Oklahoma County District Court, Case No. CF-2009-605, and issued a warrant for their arrest.  On September 23, 2009, the court found Plaintiff guilty and sentenced him to two 7-year terms of imprisonment, to be served concurrently.  Tran was found guilty and received a suspended sentence.  Plaintiff is the biological father or step-father of Tran's seven children, M.T., T.T., C.C., T.C., L.C.T., H.T., and H.A.T.T.C.

## UNDISPUTED FACTS

On February 2, 2010, the DOC received custody of Plaintiff.  (Dkt. # 30 at 3).  On March 8, 2012, Plaintiff arrived at DCCC in Hominy, Oklahoma, a medium security facility, following a transfer from John Lilly Correctional Center in Boley, Oklahoma, a minimum-security facility.  Id. Between March 8, 2012 and December 24, 2012, Plaintiff's wife visited him numerous times.  Id. Several of the children also visited, though not all at once.  Id. at 3-5.

In 2012, there was a pending parental rights termination case against Plaintiff and Tran concerning H.A.T.T.C.  (Dkt. # 30-3).  On September 24, 2012, the Oklahoma County District Court suspended visitation rights for Plaintiff "until further order."  (Dkt. # 30-5).  In late-December 2012, DCCC personnel informed Tran that she needed to provide copies of the birth certificates for the five children visiting Plaintiff.  (Dkt. # 30 at 5). Tran called Valerie Kester, a case manager at

2

DCCC, to inform Kester about the birth certificate requirement and hypothesized that "someone is playing games and not allowing the children to come [visit Plaintiff]." Id.; Dkt. # 30-6.  Kester told Tran that they (DCCC) needed the birth certificates and needed to speak with the Oklahoma County District Attorney's office to get "everything straightened out."  (Dkt. # 30-6).  Tran asked to speak with Kester's supervisor, Glenn Waldon, a named defendant, and Tran's call was transferred.  Id. Soon thereafter, Tran provided copies of the birth certificates for M.T., T.T., C.C., T.C., and L.C.T. (Dkt. # 30 at 5-6).

On January 2, 2013, Defendant Waldon submitted a recommendation regarding the visitation of Plaintiff's minor children to DCCC Deputy Warden Maurice Warrior, a named defendant.  (Dkt. # 30-8).  In the recommendation, Defendant Waldon notified Defendant Warrior that Plaintiff's field file contained a letter from the Oklahoma County District Attorney's office, dated November 30, 2011, stating that Plaintiff should have not have visits with the children.  Id.  The letter, written by Assistant District Attorney Jaclyn Rivera, a named defendant, stated that Plaintiff's "parental rights have been terminated to four children previously and two children, not biological[ly] his, were removed from his home.  He is also pending a termination trial on his fifth biological child in our custody." Id.; Dkt. # 30-4.  After reviewing the information, Defendant Warrior denied Plaintiff's request to add the children to his visitation card, citing Defendant Rivera's memorandum as cause. (Dkt. # 30-8)

On January 14, 2013, Plaintiff submitted a "Request to Staff" (RTS) to Defendant Waldon. asking why his children were not approved for visitation.  (Dkt. # 30-10).  Plaintiff stated, "[t]here is no court order in place to prevent me from seeing these children at visit." Id.  Defendant Waldon responded, stating that Defendant Warrior "denied approval of these visits due to security issues

3

stemming from your current crime and documentation in your field file." Id.  On January 22, 2013, Plaintiff submitted an Offender Grievance Report to Warden Terry Martin, a named defendant, and attached the RTS dated January 14, 2013.  (Dkt. # 30-12 at 7).  On February 5, 2013, Defendant Martin responded by providing Plaintiff a copy of the memorandum from the Oklahoma County District Attorney's Office and informed Plaintiff that "[t]his facility/DOC considers Mr. Prater[, the District Attorney for Oklahoma County,] an officer of the court and will continue to honor the attached document." Id. at 6.  On February 11, 2013, Plaintiff appealed Defendant Martin's denial to then-DOC Director Justin Jones, a named defendant.  Id. at 4.  Plaintiff stated the ground for his appeal was "[p]robable error committed by the reviewing authority in the decision." Id.  On March 12, 2013, Mark Knutson, acting as the DOC Director's designee and also a named defendant, denied the appeal because Plaintiff failed to provide any authority to "substantiate" the appeal and thus found nothing improper about Defendant Martin's denial of Plaintiff's visitation request.  Id. at 3.

On January 25, 2013, Plaintiff submitted a third RTS[1] requesting a copy of the court order that prohibits him from visiting his children.  (Dkt. # 30-14).  Plaintiff acknowledged the existence of a court order prohibiting him from contact with H.A.T.T.C., but complained that "[t]he paper from the District Attorney's Office that you attached is not a court order signed by a District Judge . . . . Also Destiny Ross[2] is not on the list either." Id.  Defendant Warrior told Plaintiff he "can go

---

[1]On January 18, 2013, Plaintiff submitted a second RTS to Defendant Warrior, again asking why he was denied visitation with his children.  (Dkt. # 30-13).  Defendant Warrior responded by stating, "[t]he Oklahoma County Seventh District State of Oklahoma Court has terminated your parental rights . . . as is documented in your field file [illegible].  The court has also ordered that you not receive visits from these children." Id.  Defendant Warrior provided Plaintiff a copy of the memorandum written by Defendant Rivera.  Id.

[2]Plaintiff alleges Destiny Ross is also his child and was denied visitation rights with her. However, Plaintiff fails to expand this claim or offer any additional facts in support.

through the court clerk and obtain that yourself." Id.  On February 13, 2013, Plaintiff submitted a fourth RTS to Defendant Warrior requesting the case number for the court order to obtain the information from the court clerk.  (Dkt. # 30-15).  Defendant Warrior responded by stating, "[t]his issue has been addressed through the Warden's office.  If you continue to submit redundant request[s], you may be placed on restriction from submitting requests due to abuse of process as per OP-090." Id.  On March 4, 2013, Plaintiff submitted a second Offender Grievance Report Form to Defendant Martin and attached two RTS forms, one dated January 25, 2013 and the other dated February 13, 2013.  (Dkt. # 30-16).  Plaintiff requested a copy of the court order or the case number to obtain the court order.  On March 6, 2013, Defendant Martin placed Plaintiff on a grievance restriction due to abuse of process.  Id.

On September 16, 2013, the Oklahoma County District Court dismissed the pending termination of parental rights case against Plaintiff and Tran as to H.A.T.T.C.  (Dkt. # 38-1 at 4-6). The court stated that the child was "successfully reunited with mother since [March 12, 2013]." Id. at 6.  On September 20, 2013, Plaintiff submitted a RTS requesting the child be added to his visitation card.  Id. at 2.  On September 27, 2013, Defendant Martin approved Plaintiff's request. Id. at 3.

On October 1, 2013, Plaintiff submitted a RTS to Kester, requesting visitation rights for C.C., T.C., and L.C.T. Id. at 7.  Tran submitted the necessary application forms and other requested documentation.  Defendant Waldon recommended approval of the applications.  (Dkt. # 38-2). However, on November 7, 2013, Defendant Warrior denied the requests for C.C. and T.C.[3] Id.

---

[3]The record is silent as to whether Defendant Waldon approved or denied the visitation as to L.C.T.

Defendant Warrior noted in the denials that the "[a]pplication is for minor who has been removed by the court from Offender Cleveland's parental rights for protection of the child.  The application is not complete with[out]  adopted parent's signature and address."  Id. at 2.  On November 8, 2013, Plaintiff submitted a RTS to Defendant Warrior asking why his sons were not approved for visitation.  Defendant Warrior responded, "[b]y legal counsel directive, I cannot discuss this matter with you."  Id. at 14.

On May 31, 2013, Plaintiff filed this civil rights action.  In the "Nature of Case" section of the complaint, Plaintiff complains that

> [T]he above Defendants committed acts and omissions under color of law, which deprived the Plaintiff of: rights, privileges, immunities, secured under the United States of America.  Plaintiff is claiming that his First, Fifth, Eight[h], and Fourteenth Amendment rights for Defendants' denied him due process to visits with his children family association, equal protection, and cruel and unusual punishment.  These acts and omissions by the Defendants' infringed on the Plaintiff's constitutional rights.

(Dkt. # 1 at 3).  Plaintiff asserts a single claim: "Defendants' Terry Mar[t]in, Maurice Warrior, Glen [sic] Waldon, Jaclyn Rivera, and Justin Jones deprived the plaintiff of his first, fifth, eighth, fourteenth amendment constitution[al] right[s] by denying him visits with his children without procedural due process of law."   Id. at 4.   Plaintiff seeks the following forms of relief: (1) declaratory relief in the form of a court order "directing Defendants' to lift the restriction that disallows the Plaintiff from visiting his children"; (2) injunctive relief in the form of a court order "that would require the Defendants to provide him with visitation with his children for 6 hours on Saturdays days [sic] and Sundays" in order to "restore a relationship with his children for the remainder of his sentence"; (3) monetary damages in the amount of $5,000,000 for violating his constitutional rights; and (4) "25% of the monetary award to attorney's fee to Plaintiff, . . . cost of this filing upon the Defendants' [sic], . . . admonish and punish each Defendants' conduct and

actions financially and publicly . . . [and d]eem the award in equivalence to justify all injury discussed in all counts above and the intrinsic value of the . . . [c]onstitutional rights of the Plaintiff." Id. at 12-13.

### ANALYSIS

Before the Court is Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment (Dkt. # 31). Defendant Rivera argues that Plaintiff has failed to state a claim against her and that she is entitled to absolute immunity, or in the alternative, qualified immunity because "the nature of Plaintiff's allegations against her occurred during the course of her advocacy for the State of Oklahoma in her role as an Assistant District Attorney." See Dkt. # 39 at 3. The remaining defendants argue Plaintiff has failed to state a constitutional claim against them and the Eleventh Amendment bars Plaintiff's claims for monetary damages. See Dkt. # 31. In the alternative, they argue they are entitled to qualified immunity. Id. After reviewing the record, the Court finds it necessary to rely on information outside of the complaint. The Court also finds that there is no genuine dispute as to any material fact. Therefore, the Court will dispose of Defendants' motion as a motion for summary judgment.

As a preliminary matter, the Court takes judicial notice of In re. H.T., 276 P.3d 1054 (Okla. Civ. App. 2012). Rule 201 of the Federal Rules of Evidence provides that a court may take judicial notice of an adjudicative fact that is not subject to reasonable dispute because it (1) is generally known within the court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. See FED. R. EVID. 201 (a), (b). See also Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017-18 (5th Cir. 1996). In re. H.T. provides important factual background to this case.

The case involves an appeal by Plaintiff and Tran after their parental rights to H.T. were terminated.  Plaintiff and Tran claimed there was insufficient evidence to support termination of their rights.  The Oklahoma Court of Civil Appeals strongly disagreed.  The court found that in 2001, the State of Oklahoma removed T.T. and M.T. from Plaintiff's home after allegations of physical abuse.  In re. H.T., 276 P.3d at 1056.  The children were returned to the home shortly thereafter.  In 2004, T.T., M.T., C.C., and T.C. were adjudicated deprived and Plaintiff and Tran "were given individual service plans in order to correct the circumstances that led to the deprived adjudication of the four children and they received deferred sentences."  Id.  However, Plaintiff and Tran failed to correct the circumstances.  "In May 2005, the state initiated a petition to terminate parental rights . . . [and t]he matter was tried to a jury in April 2006."  Id.  The jury found the children deprived and parental rights were terminated in 2006.  Id.  In reviewing the factual background, the Oklahoma Court of Civil Appeals, in In re. H.T., stated that

> The record below contains clear and convincing evidence that [the] parents did not correct the conditions which led to the termination of their parental rights to their four oldest children.  Neither parent has completed the required counseling, anger management, parenting classes or compassion workshops that might have helped them deal with their parenting responsibilities.

Id. at 1057.  The court stated that it was "especially troubling that both parents deny the need to engage in the training which DHS once sought to provide."  Id.  The court stated that Tran originally denied Plaintiff's abuse in 2003 and then "failed to acknowledge responsibility for abuse perpetrated by [Plaintiff], saying she was not there and was not responsible for those injuries" caused by Plaintiff's abuse.  Id.

The Oklahoma Court of Civil Appeals noted that "[t]he record was devoid of evidence [showing Plaintiff] completed or attempted to complete any of his parenting courses or abuse

counseling."  Id.  Plaintiff "testified that he was able to draw appropriate boundaries with respect to discipline, but children with light complexions, such as M.T. and T.T., would bruise or sustain some kind of injury or pain even if you were to 'barely tap them.'"  Id.  However, testimony at that trial revealed that M.T. and T.T. had severe, deep tissue bruising.  The court noted that Plaintiff's "testimony demonstrates an ongoing lack of regard for the abuse his step-daughters endured and a complete failure to realize his glaring need for parental instruction."  The Oklahoma Court of Civil Appeals affirmed the termination of parental rights of H.T.  Also of relevance to this case, the Oklahoma Court of Civil Appeals, in a footnote in In re. H.T., stated that L.C.T., an "older sibling" of H.T., "was the subject of a 2006 deprived petition and a 2008 jury verdict resulting appeal, which found L.C.T. to be a deprived child and terminated the parental rights of [Petitioner and Tran] with respect to L.C.T."

1.      **Legal standards**

a.      **Summary judgment**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317.  "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

### b.    Absolute and qualified immunity

A state prosecutor is entitled to absolute immunity from suits for civil damages when such suits are based on the prosecutor's performance of functions "intimately associated with the judicial phase of the criminal process." Imbler v. Pachtman, 424 U.S. 409, 430-31 (1976); Gagan v. Norton, 35 F.3d 1473, 1475 (10th Cir. 1994) (quoted case omitted). Of course, "'actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor.'" DiCesare v. Stuart,

10

12 F.3d 973, 977 (10th Cir. 1993) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993)). Absolute immunity is available if the act of the prosecutor takes place in a judicial proceeding, is fairly associated within the prosecutor's function as an advocate, or to any actions calling for a prosecutor's exercise of professional discretionary judgment in the performance of prosecutorial functions. Burns v. Reed, 500 U.S. 478, 491-92 (1991); Kalina v. Fletcher, 522 U.S. 118, 130 (1997). "Absolute immunity . . . does not extend to those actions that are investigative or administrative in nature, including the provision of legal advice outside the setting of a prosecution." Klen v. City of Loveland, Colo., 661 F.3d 498, 518 (10th Cir. 2011) (quoting Mink v. Suthers, 482 F.3d 1244, 1261-62 (10th Cir. 2007)); see also Burns, 500 U.S. at 494-95. In distinguishing between prosecutorial and investigatory actions, the Court examines the "nature of the function performed, not the identity of the actor who performed it." Kalina, 522 U.S. at 127 (citing Forrester v. White, 484 U.S. 219, 229 (1988)).

"Government officials who perform discretionary functions are entitled to qualified immunity if their conduct does not violate clearly established rights of which a reasonable government official would have known." Perez v. Unified Gov't of Wyandotte County, 432 F.3d 1163, 1165 (10th Cir. 2005) (citing Hulen v. Yates, 322 F.3d 1229, 1236 (10th Cir. 2003)); see also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability, and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). As a result, it is critical to resolve immunity questions at the earliest possible stage in the litigation. See Saucier v. Katz, 533 U.S. 194, 199-201 (2001). In Saucier v. Katz, the Supreme Court set forth a mandatory two-prong test to resolve all qualified immunity claims. When a defendant raises a qualified

immunity defense, the plaintiff bears the burden of establishing (1) that the defendant's action violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established at the time of the conduct at issue. <u>Perez</u>, 432 F.3d at 1165.  "If no constitutional right would have been violated were the allegations established," then no further inquiry regarding qualified immunity was required. <u>Saucier</u>, 333 U.S. at 201.  The Supreme Court, however, stepped back from the mandatory nature of using this two-prong analysis, <u>see</u> <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009), and now permits courts to "exercise [their] sound discretion in deciding whether to bypass the first question and proceed directly to the second." <u>Lynch v. Barrett</u>, 703 F.3d 1153, 1159 (10th Cir. 2013).

### c.    Eleventh amendment immunity

The Eleventh Amendment prevents suits against a state unless Congress abrogated the states' Eleventh Amendment immunity or the state waived such protection by statute.  <u>See</u> <u>Mt. Healthy City School Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 279 (1977).  Eleventh Amendment immunity does not extend to counties or municipalities, but does extend to "arms of the state."  <u>Northern Ins. Co. of New York v. Chatham County, Ga.</u>, 547 U.S. 189, 193 (2006).  Further, claims against a government officer in his or her official capacity are actually claims against the government entity for which the officer works.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 167 (1985).  Therefore, "it is no different from a suit against the State itself."  <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71 (1989).

2.      **Legal analysis**

a.      **No protected constitutional right**

Plaintiff claims that the Defendants violated his first, fifth, eighth, and fourteenth amendment rights when they denied him visitation rights with his children.  The Supreme Court has held that inmates have no right to unfettered visitation.  See Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989).  "The denial of prison access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence and therefore is not independently protected by the Due Process Clause.'"  Id. at 461.  Therefore, Plaintiff has no protected constitutional right in visitation rights.  However, the Supreme Court also noted "that state law may create enforceable liberty interests in the prison setting."  Id. (noting that states have created protected liberty interests in parole, good-time credits, freedom from involuntary transfer to mental hospital, and freedom from more restrictive forms of confinement within the prison) (internal citations omitted).  Thus, "'a State creates a protected liberty interest by placing substantive limitations on official discretion,'" id. (quoting Olim v. Wakinekona, 461 U.S. 238, 249 (1983)), or by "establishing 'substantive predicates' to govern official decision-making . . . and mandating the outcome to be reached upon a finding that the relevant criteria have been met," id. (citing Hewitt v. Helms, 459 U.S. 460, 472 (1983)).

Here, Defendants argue that DOC policy, OP-030118, governs all visitation rights of inmates in state custody.  (Dkt. # 31 at 9).  Defendants claim the "visitation policy provides [them] the authority to make an informed decision to impose the visitation restriction." Id. at 9-10.  Defendants argue the imposed restriction is related to two legitimate penological interests – protecting the children's safety and security concerns.  Id. at 10.  Defendants contend that the restriction imposed

13

on Plaintiff's visitation privileges does not run afoul of the four-part test in <u>Turner v. Safley</u>, 482 U.S. 78, 89-91 (1987), and thus does not violate his constitutional rights.  (Dkt. # 31 at 10).

In <u>Turner</u>, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.  In our view, such a standard is necessary if 'prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations.'" <u>Turner</u>, 482 U.S. at 89 (internal citation omitted).   The Court outlined four factors "relevant in determining the reasonableness of the regulation at issue."  <u>Id.</u>

> First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it. . . . [S]econd factor . . . is whether there are alternative means of exercising the right that remain open to prison inmates. . . . [T]hird consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. . . . [Fourth,] the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

<u>Id.</u> at 89-90 (citations omitted).  The Supreme Court applied this test in <u>Overton v. Bazetta</u>, 539 U.S. 126 (2003).   In <u>Overton</u>, an inmate challenged a visitation restriction imposed by Michigan Department of Corrections, after he was restricted from visitation with his daughter.  The inmate alleged the restriction violated his First, Eighth, and Fourteenth Amendment rights.  The Court upheld the visitation restriction, finding that the regulations "satisfy each of the four factors" in <u>Turner</u>.  <u>Overton</u>, 539 U.S. at 126.  The Court found that the restrictions on child's visitation were related to "valid interests in maintaining internal security and protecting child visitors from exposure to sexual or other misconduct or from incidental injury."  <u>Id.</u>

After reviewing OP-030118, the Court finds that (1) Oklahoma did not create a protected liberty interest in its visitation policy, and (2) it satisfies the four factor test in <u>Turner</u>, and thus, is

a reasonable restriction.  The first sentence of the policy reads, "[v]isitation is a privilege, not a right." (Dkt. # 31-1 at 2).  Additionally, discretionary language is used throughout the policy.  Some examples include: "[e]ach facility may set its own limit regarding the number of visitors approved," id.; "children under the age of 18 years may be approved to visit an offender when accompanied by a parent, legal guardian, or responsible adult who is authorized to visit the offender," id. at 4-5; "[u]pon clearance through this system, the individual may be added to the offender's permanent visiting list and authorized to visit," id. at 6; and "[v]isits may be temporarily suspended by the facility head," id. at 7.  The few instances of mandatory language in the policy are insufficient to deem that this policy establishes a protected liberty interest.[4]  This policy does not mandate the outcome to be reached nor does it set out particular criteria necessary to reach a certain outcome. Therefore, the Court concludes that the State of Oklahoma did not create a protected liberty interest in its visitation policy.

Even if this Court had concluded there was a constitutional right in visitation, the visitation restriction imposed in this case satisfies the four-prong test in Turner, making it a reasonable restriction on a constitutional right.  First, security concerns and the safety of minor children are legitimate penological interests.  See Overton, 539 U.S. at 133; Wirsching v. Colorado, 360 F.3d 1191, 1199-1200 (10th Cir. 2004).  Defendants also based their decision on the security of these specific children because Plaintiff's conviction and incarceration was for child abuse of his own

---

[4]Some examples of mandatory language in the DOC policy include: "[t]o become an approved visitor, the individual must complete a visitor's application to visit . . . and submit a copy of a state issued photo I.D. or driver's license," (Dkt. # 31-1 at 6); "[t]hese children must be natural or adopted children of the offender they are visiting," id. at 5; and "[v]isits will be structured to allow informal communication between the offender and visitor, as well as the opportunity for physical contact, such as brief kiss and embrace at the beginning and end of the visit," id. at 9.

children and step-children.  Second, the restriction on Plaintiff's visitation rights did not foreclose the opportunity to communicate with his children through hand-written letters or phone conversations.  In fact, Plaintiff provided examples of letters he received from his children as exhibits attached to his response.  See Dkt. # 32.  Additionally, the restriction was never characterized as a permanent restriction, nor a total ban.  See Dkt. # 40 at 8.  DOC policy, OP-030118, allows for the modification of a visitation restriction with minor children if the legal guardian completes the necessary paperwork.[5]  See Dkt. # 31-1 at 7-8.

As to the third and fourth factors, Defendants argue that because Plaintiff is the abuser of these children, "[i]t is reasonably foreseeable that if [visitation were allowed], one of the children would cause a disruption when in the presence of their former abuser."  (Dkt. # 31 at 11).  This, Defendants argue, would require additional prison personnel during visitation.  Defendants also argue that the restriction is narrowly tailored to restrict only those children to whom his parental rights were terminated and Plaintiff is allowed visits with other family members and friends.  Id. at 13.  Plaintiff argues that if it were "reasonably foreseeable" that his children would cause a disruption, then it "would have already occurred during one of the fifteen (15) visitation sessions that Plaintiff has already had, disruption-free, with these same children."  (Dkt. # 32 at 7).  Plaintiff maintains that "there has never been a court order that requires complete severance of any kind of relationship between Plaintiff and the children."  Id. at 8.  While the Court agrees that there is no Court order requiring a "complete severance of any kind of relationship between Plaintiff and the children," the State of Oklahoma, as explained in In re H.T., terminated Plaintiff's parental rights

---

[5]The Court notes that visitation rights with H.A.T.T.C. were restored after a state court dismissed the termination of parental rights suit brought against Plaintiff and Tran.  See Dkt. # 38.

to T.T., M.T., C.C., T.C., L.C.T, and H.T.  Based on the language of the DOC visitation policy, this fact has a direct impact on Plaintiff's visitation privileges with his children because visitation eligibility requires notarized permission from the legal guardian of the children.  See Dkt. # 31-1 at 4-5.  Finally, the Court gives "substantial deference . . . to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."  Wirsching, 360 F.3d at 1200.  Plaintiff has failed to provide an argument to overcome the deference afforded prison officials in the matters of prison administration.  Therefore, after a review of the DOC policy and Plaintiff's claims, had this Court found Plaintiff had a protected constitutional right in visitation, the visitation restriction satisfies the test set forth in Turner and it does not impermissibly violate Plaintiff's constitutional rights.

Plaintiff also raises several miscellaneous complaints related to his due process claims.  First, he argues that he was not properly informed "as to the reason why his visitation with his children was being suspended."  (Dkt. # 32 at 4).  Plaintiff also claims that the Defendants "changed their stance" and now claim to have restricted the children's visits because they "could present security concerns."  Id. at 6.  Finally, Plaintiff argues that Defendants' claim that "the children would be 'undoubtedly traumatized' should Plaintiff be allowed visitation with them is nothing more than an unnecessary misplaced attempt to evoke an emotional response from the court on this issue."  Id. at 7.  Plaintiff argues that the "children were not and would not be in any harm" because the "visitation sessions at DCCC are closely monitored [with] video surveillance . . . and at least two [] correctional officers in the fairly small room at all times."  Id. at 8.

17

To the extent Plaintiff complains that his constitutional rights were violated because he was not informed of the visitation restriction as required by DOC policy, OP-030118, Plaintiff's claim is misplaced.  "'[A]n expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause.'"  Elliott v. Martinez, 675 F.3d 1241, 1245 (10th Cir. 2012) (quoting Olim, 461 U.S. at 250 n.12).  "Thus, 'an entitlement to nothing but procedure cannot be the basis for a liberty or property interest.'"  Id. (quoting Stein v. Disciplinary Bd. of Sup. Ct. of N.M., 520 F.3d 1183, 1192 (10th Cir. 2008)).  Therefore, Plaintiff has no basis for relief.

To the extent Plaintiff is arguing the Defendants are "chang[ing] their stance" as to the reasons why the visitation restrictions were put into effect, the Court disagrees with Plaintiff's assertions.  Defendants informed Plaintiff that the restrictions resulted from security concerns based on his conviction and the memorandum from Defendant Rivera stating his parental rights were terminated as to four of his children.  Further, the reasons for the restrictions have not changed during the course of this litigation.

Finally, Plaintiff's argument that the children would not be in any harm due to the amount of video surveillance and visitation monitoring by DCCC, misses the point.  The Court affords substantial deference to prison officials making administrative decisions.  These decisions consider the full context of an inmate request, including the impact on other inmates, prison officials, and potential effects on other visitors at DCCC.  In light of Plaintiff's convictions and the termination of his parental rights several years before the denial of visitation, the visitation restriction put in place by Defendants is not unreasonable.

The Constitution does not mandate comfortable prisons, thus conditions and regulations may be restrictive or even harsh without violating constitutional rights.  See Rhodes v. Chapman, 452

18

U.S. 337, 349 (1981); <u>Barney v. Pulsipher</u>, 143 F.3d 1299, 1311 (10th Cir. 1998); <u>Rocha v. CCCF Admin.</u>, 408 F. App'x 141, 143 (10th Cir. 2011) (unpublished).[6]   Here, Plaintiff has failed to demonstrate how the visitation restriction violated his constitutional rights.   Therefore, after reviewing the entire record in the light most favorable to Plaintiff, and for the reasons stated above, the Court concludes that there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law.

### b.   Immunity

As to Defendants' claims of immunity, the Court finds that all Defendants are entitled to qualified immunity from individual liability.[7]   All of the Defendants are government officials and were acting in their official capacity during the events that gave rise to Plaintiff's complaint. They are entitled to qualified immunity from individual liability unless Plaintiff can show their actions violated a clearly established constitutional right.   <u>See</u> <u>Perez</u>, 432 F.3d at 1165.   Plaintiff bears the burden of establishing the violation of a constitutional right and, as stated above, he has failed to do so.   Therefore, having found no constitutional violation, Defendants are entitled to qualified immunity.   <u>Id.</u>

---

[6]This and other unpublished court decisions are cited as persuasive authority, pursuant to Tenth Circuit Rule 32.1.

[7]The Court acknowledges that Defendant Rivera claims she is entitled to absolute immunity because her actions "occurred during the course of her advocacy for the State of Oklahoma." (Dkt. # 39 at 3).  However, nothing in the letter sent from Defendant Rivera to DOC officials resulting in their decision to restrict Plaintiff's visitation rights supports a finding that the letter was part of the prosecution of Plaintiff in Oklahoma County, Case No. JD-2009-379.  <u>Id.</u> at 7.  Defendant Rivera admits that the letter "obviously does nothing more than provide factual information regarding the status of parent rights between Plaintiff and various children." (Dkt. # 39 at 8).  The Court finds that even though the letter may be advocating on behalf of Plaintiff's minor children, it is administrative in nature and is outside the setting of a prosecution.  Thus, Defendant Rivera is not entitled to absolute immunity.

Finally, Plaintiff also brought suit against the Defendants in their official capacity. <u>See</u> Dkt. # 1. Defendant Rivera argues that the claim should be dismissed with prejudice because she is a state employee and a state employee cannot be held liable for an alleged civil rights violation "because neither a state, its agencies nor its officials are 'persons' under 42 U.S.C. § 1984 or § 1983." (Dkt. # 39 at 13 (citing <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58 (1989)). The remaining Defendants, as employees of Oklahoma DOC, argue they are entitled to Eleventh Amendment immunity. (Dkt. # 31 at 16).

The Tenth Circuit has declared that "DOC is an arm" of Oklahoma and it entitled to absolute immunity under the Eleventh Amendment. <u>Eastwood v. Dep't of Corr. of State of Okla.</u>, 846 F.2d 627, 631-32 (10th Cir. 1988). The Tenth Circuit has also found that under Oklahoma law, a district attorney is an arm of the state and is entitled to Eleventh Amendment immunity protection as well. <u>Erikson v. Pawnee Cnty. Bd. of County Comm'rs</u>, 263 F.3d 1151, 1153 (10th Cir. 2001) (citing <u>Arnold v. McClain</u>, 926 F.2d 963, 965-66 (10th Cir. 1991)). As a result, all of the Defendants are state officers under Oklahoma law and are entitled to Eleventh Amendment immunity from claims against them in their official capacities. <u>See</u> <u>Northern Ins. Co. of New York</u>, 547 U.S. at 193.

## CONCLUSION

The Court concludes that Plaintiff failed to demonstrate that the visitation restrictions violated any constitutional rights under the First, Fifth, Eighth, or Fourteenth Amendments to the United States Constitution. There is no dispute as to any material fact. Defendants are entitled to summary judgment in their favor.

**ACCORDINGLY, IT IS HEREBY ORDERED that:**

1.    Defendants' motion to for summary judgment (Dkt. # 31) is **granted**.

2.    Defendants' alternative motion to dismiss (Dkt. # 31) is **declared moot**.

3.    This is a final order terminating this action.

4.    A separate judgment shall be entered in this case.


**DATED** this 18th day of April, 2014.


**TERENCE KERN**
**United States District Judge**

21